## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE PENNSYLVANIA TRUST** | : | |
| **COMPANY, Guardian of the Estate** | : | **CIVIL ACTION** |
| **of Ethan Waltman, a Minor,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DOREL JUVENILE GROUP, INC.,** | : | **No. 07-4029** |
| **Defendant.** | : | |

### MEMORANDUM

**Schiller, J.**                                                        **August 25, 2011**

This case is about an injured child and the allegedly defective Cosco Grand Explorer-model child seat that Plaintiff claims caused his injuries when his mother drove the family minivan into a tree. Following rounds of supplemental briefing and conferences with the parties, it has become clear that this lawsuit must go into suspense — for the second time in four years — due to uncertainty in the governing law arising from a conflict between the Third Circuit and Pennsylvania Supreme Court. This uncertainty precludes resolution of any motion that implicates the differences between the Second and Third Restatements of Torts. Six of the parties' *Daubert* motions also require additional hearings. However, as discussed below, the Court will takes up the balance of the twenty-eight motions in limine currently pending in this case.

## I.      BACKGROUND

On March 4, 2006, Kimberly Waltman was driving her two-year-old son, Ethan Waltman, in the back seat of her minivan. (*See, e.g.*, Pl.'s Mem. in Supp. of Mot. re: Removal from Vehicle 1-2.) Ethan was badly hurt when Kimberly drove the minivan into a tree. (*Id.*) Plaintiff alleges that

Ethan was strapped into a Cosco Grand Explorer booster seat.[1]  Due to the seat's alleged defects, Plaintiff claims Ethan's torso flexed forward during the crash, causing his face to strike the seat's plastic booster shield.  (*See id.* at 2.)

Ethan's father, Benjamin Waltman, commenced this litigation on Ethan's behalf in the Philadelphia Court of Common Pleas.  Defendant removed the case to this Court on September 25, 2007.  The late Judge Thomas Golden, to whom this matter was initially assigned, placed the lawsuit in suspense in 2009 pending resolution of a related case in state court.  Judge Golden denied the parties' pretrial motions without prejudice at that time.

This Court lifted the stay on May 4, 2011, upon notice that the Pennsylvania Supreme Court had declined Dorel's leave to appeal in the related state-court litigation.  Two weeks later, the parties filed thirty motions in limine, including defense requests for spoliation sanctions and to strike certain negligence and warranty claims.  After a hearing and a series of teleconferences with counsel, the Court granted Dorel's motion for spoliation sanctions and denied the motion to strike.

In deciding the motion to strike, the Court observed that the Third Circuit had triggered an intra-district split with its opinion in *Berrier v. Simplicity Manufacturing*, 563 F.3d 38 (3d Cir. 2009).  Although the Third Circuit predicted in *Berrier* that Pennsylvania would apply the Third Restatement of Torts to products liability cases, the Pennsylvania Supreme Court and a number of courts in this District subsequently observed that the Second Restatement of Torts continues to apply.  This Court thus held that it was bound to apply the Second Restatement.

---

[1] During this litigation, Cosco, Inc., the Grand Explorer's manufacturer, merged into another corporation to form Dorel Juvenile Group, Inc. ("Dorel" or "DJG").  The parties stipulated to dismissal of Cosco and agreed that Dorel is the proper defendant in this case as Cosco's successor-in-interest in October of 2007.

The day the Court issued its order addressing the Restatement issue, another Third Circuit panel applied the Third Restatement to a Pennsylvania products liability case — apparently due to that tribunal's internal operating procedures. *Covell v. Bell Sports, Inc.*, App. A. No. 10-3860, 2011 WL 2690396, at *6 (3d Cir. July 12, 2011). A petition for review en banc is currently pending in *Covell*. Meanwhile, the Pennsylvania Supreme Court has indicated that it may take up the question again. *See Lance v. Wyeth*, 15 A.3d 429 (Pa. 2011). The parties in this action have also been unable to reach agreement as to the appropriate standard for this products liability action. (Position Statement of the Parties on Applicable Law Governing the Case at Trial.) The Court has determined that the best course, to avoid wasting the parties' efforts and resources, will be to place the case in suspense pending resolution of this conflict.

This uncertainty in the substantive law precludes resolution of some of the parties' motions in limine, as the Court's decision regarding which Restatement governs would prove dispositive with respect to arguments grounded in the underlying legal standard. (*See* Position Statement of the Parties on Applicability of Restatement (Third) of Torts to Outstanding Motions [Parties' Position Statement] 3.) Rulings on many of the parties' Daubert motions must also be deferred pending a *Daubert* hearing. The Court will address the remaining motions on the merits.

## II.   STANDARD OF REVIEW

### A.   Relevance and Prejudice

All relevant evidence is admissible; irrelevant evidence is inadmissible. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. R.

Evid. 401.  Regardless, the Court may exclude relevant evidence if its probative value is substantially outweighed by its prejudicial effect.  Fed. R. Evid. 403; *see also United States v. Universal Rehabilitation Servs. (PA), Inc.*, 205 F.3d 657, 664 (3d Cir. 2000).

### B.    Expert Testimony

The parties have filed a number of *Daubert* motions seeking to exclude expert testimony. The Court will admit expert testimony that is:  (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (3) the product of a reliable application of these principles and methods to the facts of the case.  *See* Fed. R. Evid. 702.  A putative expert must have "specialized knowledge" — which can be based on "practical experience as well as academic training and credentials" — on the topic to which he seeks to testify.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (internal quotations omitted).  "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996).

An expert's testimony must also "fit" the facts of the case.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742-43 (3d Cir. 1994).  When an expert offers his opinion based on experience, "he must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative." *Roberson v. City of Phila.*, Civ. A. No. 99-3574, 2001 WL 210294, at *4 (E.D. Pa. Mar. 1, 2001).  The proponent of the testimony bears the burden of establishing its admissibility by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).

### III.    DISCUSSION

The parties' motions in limine fall into three categories:  (1) *Daubert* motions; (2) motions focused solely on the relevance or prejudicial effect of particular evidence; and (3) miscellaneous motions turning on another rule or rules of evidence.  As a threshold matter, the Court will also deny without prejudice four motions that cannot be resolved now because they implicate the differences between the Second and Third Restatements.  The parties — and the Court — agree that resolution of Plaintiff's motions to exclude evidence of Kimberly Waltman's and Rebecca Polson's negligence and to preclude evidence of Dorel's compliance with Federal Motor Vehicle Safety Standards ("FMVSS") may turn on which Restatement the Court applies.  (*See* Parties' Position Statement 3.) The Court will therefore deny these motions without prejudice.

In addition, Plaintiff seeks to preclude Dorel from introducing evidence that Ethan was removed from the minivan after the accident by an anonymous passerby, who subsequently left the scene and was never located.  (Pl.'s Mem. in Supp. of Mot. re: Removal from Vehicle 2.)  Dorel observes that there is expert testimony in the record that "Ethan's removal could have caused further damage, and an emergency services responder . . . at the crash site confirmed the bystander's removal of Ethan was problematic."  (Def.'s Opp'n re: Removal from Vehicle 2.)  It intends to present this evidence in support of its argument that Kimberly Waltman's negligence was the sole cause of Ethan's injuries.  (*Id*. at 4.)  Because it is not yet clear whether evidence of Kimberly Waltman's negligence will be admissible, the Court is not in a position to determine whether evidence of the bystander's actions will be relevant and otherwise admissible at trial.  The Court will therefore deny this motion without prejudice.

### A.   Daubert Motions

The parties have requested *Daubert* hearings on any motions which the Court is inclined to grant based on the papers already filed.  (Joint Statement of the Parties on Oral Argument and Hr'gs for Outstanding Mots. ¶ 3.)  The Court has identified six motions for which additional hearings would be beneficial:  (1) Plaintiff's motion to exclude Dr. Shavelle's testimony regarding life expectancy; (2) Dorel's motion to strike the testimony of Allan Kam; (3) Dorel's motion to strike the testimony of Edward Karnes; (4) Dorel's motion to strike the testimony of Richard Herman regarding life expectancy; (5) Dorel's motion to strike the testimony of Gary Whitman regarding child growth; and (6) Dorel's motion to strike certain Australian statistical evidence.  The Court will schedule hearings on these motions at a later date.  The parties' remaining *Daubert* motions are discussed below.

### 1.   *Testimony of William Van Arsdell (Document No. 124)*

Plaintiff seeks to limit the testimony of Dorel's child safety seat expert, William Van Arsdell. Plaintiff argues Van Arsdell is not an expert in child seat design, as his "expertise . . . has been developed solely for litigation."  (Pl.'s Van Arsdell Mot. ¶ 5.)  Plaintiff's arguments implicate the "specialized knowledge" prong of the *Daubert* standard.  Specifically, Plaintiff challenges Van Arsdell's competence to render six of the nine opinions referenced in his report due to his lack of "pre-litigation" experience in the field.  (Pl.'s Van Arsdell Mem. 3-5.)

Van Arsdell is a licensed professional engineer with three degrees in mechanical engineering: a B.S. from the University of Arizona, a master's from the University of Illinois, and a Ph.D. from the Massachusetts Institute of Technology ("MIT").  (Def.'s Van Arsdell Opp'n Ex. 1, Van Arsdell Decl. ¶¶ 1, 4.)  He is also a certified Child Passenger Safety Technician and has had training in

accident reconstruction at Northwestern University.  (Pl.'s Van Arsdell Mem. Ex. B, Van Arsdell

CV.)  Van Arsdell has run hundreds of crash tests during his career as a test engineer and litigation

consultant, although it appears all of these tests were performed for use in litigation.  (*See* Van

Arsdell Decl. ¶ 14.)

　　　　The fact that Van Arsdell has gained experience through litigation speaks to his credibility,

not to his qualifications.  *See In re Paoli*, 35 F.3d at 753-54; *see also McGee v. Evenflo Co.*, Civ. A.

No. 02-259, 2003 WL 23350439, at *3 (M.D. Ga. Dec. 11, 2003).  Indeed, other courts have rejected

substantially identical challenges to Van Arsdell's expertise on this ground.  *See, e.g., Hendrix v.*

*Evenflo Co.*, 255 F.R.D. 568, 587 (N.D. Fla. 2009) (permitting Van Arsdell to offer expert opinion

regarding biomechanics of car seat-related injury and compliance with Federal Motor Vehicle Safety

Standard 213); *Mommsen v. Toyota Motor Corp.*, Civ. A. No. 07-455, 2008 WL 5427734, at *2

(W.D. Wis. Oct. 27, 2008) (denying motion to exclude Van Arsdell's seatbelt design opinions as

"Van Arsdell is a professional engineer who has performed hundreds of tests on seatbelts.").  This

Court likewise concludes that Van Arsdell's practical experience in evaluating restraint systems,

coupled with his academic training as a mechanical engineer, qualifies Van Arsdell to offer an expert

opinion on the child seat's design.

　　　　Plaintiff also argues that Van Arsdell may not testify that the Cosco satisfies FMVSS 213's

requirements because such testimony would constitute an impermissible legal conclusion.  Engineers

are qualified to opine as to whether restraint systems comply with FMVSS.  *Hendrix*, 255 F.R.D. at

590 (permitting engineering testimony regarding compliance with FMVSS 213); *cf. Raley v.*

*Hyundai Motor Co.*, Civ. A. No. 08-376, 2010 WL 199976, at *4 (W.D. Okla. Jan. 14, 2010)

(barring testimony that compliance with FMVSS does not render products "safe" as an opinion

constituting "in substance, the arguments of counsel")  The Court will therefore permit Van Arsdell to offer this opinion.

Finally, Plaintiff argues that Van Arsdell should not testify as to the relative severity of the crash, because his report merely parrots one of Dorel's other experts on this point.  (Pl.'s Van Arsdell Mem. 3 n.2.)  Plaintiff does not identify the other expert or develop this argument further, although it appears Plaintiff is referring to Jeya Padmanaban, a defense statistician.  To the extent Van Arsdell's testimony is cumulative of another expert's testimony, Plaintiff is free to raise this objection at trial.  Presently, however, the Court declines to exclude Van Arsdell's testimony regarding the severity of the crash on this ground.

### 2.    Testimony of Catherine Corrigan (Document No. 126)

Dorel has retained Catherine Ford Corrigan as an expert.  Plaintiff argues that Corrigan is not qualified or competent to offer an opinion as to the cause of Ethan Waltman's hydrocephalus and brain injury because she is not a medical doctor.  (*See* Pl.'s Corrigan Mot. ¶¶ 3-4.)  Plaintiff also states that Corrigan's opinion on this subject lacks foundation and is unreliable.  (Pl.'s Corrigan Mem. 3, 5.)  Neither of these arguments carries the day.

### a.    Foundation

The basis for Plaintiff's argument that Corrigan has not laid a proper foundation for her opinions appears to be Corrigan's alleged failure to mention the brain injury in her expert report. (*Id*. at 8.)  However, Corrigan's report and deposition testimony demonstrate that she has consistently attributed all of Ethan's injuries, including his brain injuries, to the energy created by the minivan crashing.  (*See* Pl.'s Corrigan Mem. Ex. B, Corrigan Dep. 21.)  Indeed, Corrigan's opinion is consistent with the conclusion of Plaintiff's medical expert, Dr. Joseph Burton, who

concluded that Ethan may have suffered "some initial concussive injury to the brain simply because of the stretching of the brain stem from the tension injury" to his spine and that the spine injury "resulted in some secondary pathological changes to the brain, including hydrocephalus." (Def.'s Corrigan Opp'n Ex. A, Mar. 2, 2009 Burton Dep. 10-11.)

Corrigan addressed Burton's findings in her report, observing that her analysis indicated that Ethan's injuries "were a result of the severity of the subject collision and were not related to restraint-specific parameters." (Corrigan Report 13-14.) There thus appears to be adequate foundation for the dispute between the experts to develop at trial: both agree that Ethan's neck injuries contributed to his brain injuries, but disagree as to the biomechanical cause of those injuries.

### b.    Qualifications

Corrigan is a biomechanical engineer. Plaintiff argues that establishing the cause of a brain injury is a medical question that Corrigan, who is not a medical doctor, is not qualified to answer. A medical degree is not a prerequisite to qualification as an expert capable of testifying as to the cause of a person's injuries. *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 742-43 (N.D. Ill. 2005) (concluding that Corrigan's qualifications entitled her to testify as to biomechanical causes of plaintiff's injuries due to allegedly defective forklift); *see also Yu-Santos v. Ford Motor Co.*, Civ. A. No. 06-1773, 2009 WL 1392085, at *13 (E.D. Cal. May 14, 2009) ("The court is not persuaded given that Defendants cite no legal authority for their proposition that only medical doctors are qualified to provide opinions on injury causation and biomechanics."); *Dorsett v. American Isuzu Motors*, 805 F. Supp. 1212, 1224 (E.D. Pa. 1992), *aff'd* 977 F.2d 567 (3d Cir. 1992) (holding that expert experienced in biomechanics could testify as to cause of injury sustained in rollover accident).

Corrigan is not being asked to specify the type of injuries Ethan suffered; rather, she has

analyzed the causes of his injuries based on the forces involved in the car accident. A biomechanical engineer with Corrigan's training and experience is qualified to opine on such matters. Corrigan holds a Ph.D. in medical engineering from Harvard and MIT, an M.S. in mechanical engineering from MIT, and a B.S. in bioengineering from the University of Pennsylvania. (Def.'s Corrigan Opp'n Ex. C, Corrigan professional profile.) She worked for Harvard Medical School and Beth Israel Hospital's Orthopedic Biomechanics Laboratory as a researcher, and has published extensively in the field of biomechanics. (*Id*.) She clearly has "skill or knowledge greater than the average layman" and satisfies the Third Circuit's liberal expert qualification standard. *See generally Campione v. Kivatisky*, Civ. A. No. 09-2019, 2011 WL 2937354, at *4 (D.N.J. July 19, 2011) (citing *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).

### c.     Method

Plaintiff argues Corrigan's opinion is not based on accepted scientific research and literature, and is generally unreliable. Specifically, Plaintiff states that "the relevant science and literature does not support a theory that the brain injury could occur absent" an impact to the head. (Pl.'s Corrigan Mem. 5.) Plaintiff does not specify which scientific reference or literature supports its assertion. Regardless, Corrigan's method satisfies this Circuit's reliability standard.

To assess reliability, courts consider whether the expert opinion is based on methods and procedures of science rather than the expert's subjective belief or unsupported speculation. *In re Paoli*, 35 F.3d at 742. Factors guiding this analysis include: (1) whether the method features a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the technique is generally accepted; (6) the relationship of the technique to

methods which have been established to be reliable; (7) the expert's qualifications to testify based on the methodology; and (8) the method's history of non-judicial uses. *Id*. at 742 n.7; *see also Salamone v. Wal-Mart Stores East, LP*, Civ. A. No. 10-892, 2011 WL 2787788, at *1 (E.D. Pa. July 15, 2011).

The existence and effect of the physical forces Corrigan identifies constitute a testable hypothesis that can be validated through an identifiable methodology. *Cf. Cantor v. Perelman*, Civ. A. No. 97-586, 2006 WL 3462596, at *8 (D. Del. Nov. 30, 2006) (describing vehicle design as a testable hypothesis) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000)). In this case, Corrigan's method included a review of the case files, inspection of an exemplar vehicle and seat with a surrogate subject, an accident reconstruction performed by a licensed professional engineer, and a biomechanical analysis of the collision forces at work in the minivan's passenger cabin at the time of impact. (*See* Corrigan Report 4, 10.) There is ample literature on accident reconstruction, sled testing and biomechanics that has refined Corrigan's method through peer review. Corrigan is qualified to apply and testify based on this methodology. Particularly as Plaintiff does not raise a specific challenge to the reliability of Corrigan's opinion with respect to any of the remaining factors, the Court is satisfied that Corrigan may testify as to the biomechanical causes of Ethan Waltman's injuries. The Court will therefore deny Plaintiff's motion.

### 3.    *Defense expert testimony as to neck loading (Document No. 130)*

Plaintiff argues that Dorel's experts rely on testing that produces misleading neck tension data due to shortcomings in the design of the Hybrid III anthropomorphic test device, or "crash test dummy." The Hybrid III dummies can measure "neck loads" that indicate the amount and direction of forces experienced by the dummy's upper cervical spine. However, Plaintiff asserts that the

Hybrid III dummies' heads are more likely to strike their chests than humans' heads would be, creating misleadingly high neck load readings.  Due to this testing defect, Plaintiff asserts that the scientific community has rejected the sorts of tests Dorel's experts have performed as unreliable for the purpose of assessing the risk of cervical injury.  The Court will deny Plaintiff's motion.

Plaintiff's argument that the scientific community has rejected neck tension data based on the Hybrid III rests primarily on three documents:  (1) a decision by the NHTSA not to incorporate neck tension requirements into FMVSS 213; (2) an article entitled Prediction of Cervical Spine Injury Risk for the 6-Year-Old Child in Frontal Crashes (the "Sherwood Article"); and (3) an article entitled Assessment of 3 and 6-Year-Old Neck Injury Criteria Based on Field Investigation, Modeling, and Sled Testing (the "Sochor Article").  None of these documents is persuasive.

### a. The NHTSA decision

Plaintiff characterizes the NHTSA's decision not to impose neck tension limits on child seat manufacturers as a rejection "of the use of neck tension limits or any other neck injury criteria." (Pl.'s Mem. re: Neck Loading 9.)  However, this regulatory decision sheds little light on the scientific reliability of the Hybrid III dummy or neck tension testing.  As a threshold matter, the Court observes that Plaintiff conflates two different types of Hybrid III dummies: a three-year-old model and a six-year-old model.  The NHTSA criticized "unrealistic stretching and bending" present in neck testing involving the six-year-old dummy.  (Pl.'s Mot. re: Neck Loading Ex. C, NHTSA report 37651.)  The dummy used by the experts in this case, however, is the three-year-old model. (Def.'s Resp. re: Neck Loading 2, 5.)  The three-year-old dummy is seventeen pounds lighter than the six-year-old model and is significantly shorter.  (*Id*. at 4; *see also* Sochor Article 5 (depicting three- and six-year-old dummies side-by-side).)  Commentary on the six-year-old dummy is thus of

limited probative value with respect to the design and function of the three-year-old model.

Furthermore, the NHTSA indicated that it did "not believe that enough is known regarding neck injury for children" to impose a mandatory standard for neck injury. (NHTSA report at 37652.) Among the criteria the agency considered were uncertainty as to what countermeasures seat manufacturers might use to meet the proposed neck loading standard, whether other injury protection measures might be sacrificed as a result, and the advice of various advocacy groups that more research was needed to measure neck force and moment parameters to set a compliance range. (*Id.* at 37651.) This decision rejected a neck loading safety standard; it did not reject neck load testing or the Hybrid III dummies.

### b. *The Sochor and Sherwood articles*

The articles Plaintiff provides also shed little light on the reliability of the three-year-old Hybrid III dummy. One focuses exclusively on the six-year-old model. (Sherwood Article 206 (describing sled tests using the Hybrid III six-year-old dummy).) This article also focuses on children much older than Ethan, as witnessed by the authors' use of a 12-year-old cadaver as a comparator and their stated objective of predicting cervical spine injury risk for six-year-olds. (*Id.* at 206-07.) It does not suggest the Hybrid III three-year-old dummy is unreliable for the purposes of this case.

Plaintiff also relies on an article by Mark Sochor that assesses neck injury criteria for three-year-old children. Sochor's study employed both Hybrid III three- and six-year-old dummies in sled testing. (Sochor Article 4.) The study observed that peculiarities of the design of both dummies "significantly affected neck injury values" in testing. (*Id.* at 16.) However, the authors observed that the Hybrid III dummies are nevertheless "the best available tools for assessing child neck injury

potential," and simply cautioned that "judgment is needed in interpreting the neck data from tests with belt restraint systems." (*Id*. at 16-17.) This conclusion is hardly a repudiation of neck load testing using the three-year-old Hybrid III dummy.

c.    *Conclusion*

Plaintiff's expert, Gary Whitman, has himself conducted federally-funded testing on the accuracy and "biofidelity" of the Hybrid III three-year-old dummy. (Def.'s Resp. re: Neck Loading Ex. B, Whitman, et al., A Method for the Assessment of Tethered and Untethered Child Restraint Systems Using the Hybrid III Three Year Old Dummy [Whitman Article].) *See also Thomas v. Evenflo Co.*, Civ. A. No. 02-2001, 2005 WL 6133409, at *8 (N.D. Ala. Aug. 11, 2005) (discussing Whitman's qualifications, including sled testing to evaluate accuracy of Hybrid III three-year-old dummies). Whitman observed in this article that the Hybrid III three-year-old dummy "sufficiently represented the general kinematics" of children in real-life cases he used for comparison. (Whitman Article 53.) He also observed that the dummy "demonstrated a capability to differentiate between restraint configurations," despite the fact that its upper neck response appeared unnaturally high. (*Id*. at 53-54.)

Whitman confirmed at his deposition that as long as a researcher calculates neck injury criteria consistently, the data can be used for comparative purposes to determine whether different seat designs yield different results. (Def.'s Resp. re: Neck Loading Ex. D, Feb. 20, 2009 Gary Whitman Dep. 167.) Both of Dorel's experts couch their results in these terms, comparing neck tensile loads during frontal collisions between Cosco Grand Explorers and forward-facing, five-point seats. (Def.'s Resp. re: Neck Loading Ex. A, Corrigan Report 13; Ex. B, Van Arsdell Report 14.)

Dorel's experts, Van Arsdell and Corrigan, are both qualified to interpret the data produced

in studies involving the Hybrid III three-year-old dummy.  As discussed above, both are engineers who are experienced in this field.  Corrigan in particular has extensive experience in research on child restraints involving test dummies.  (*See* Def.'s Resp. re: Neck Loading Ex. C, Corrigan Decl. ¶ 4.)  By using the data they produce for comparative purposes, Dorel's experts have controlled for the potential error in neck loading readings due to the dummy's design.  The relevant literature indicates that these tests are reliable and have been subjected to peer review.  (*See generally* Corrigan Decl. ¶ 8 and attached exhibits.)  These dummies are employed in a method featuring a testable hypothesis, namely whether certain seat designs permit greater tensile forces on the neck than others.  The Court therefore concludes that this testing satisfies *Daubert*'s requirements and will deny Plaintiff's motion.

### 4.     Testimony of Allan Kam (Document No. 144)

Dorel seeks to exclude the testimony of Allan Kam, a former NHTSA employee.  Plaintiff indicates that Kam will testify "as an expert on the NHTSA and its history, procedures, defect investigations, studies, opinions, and rule-making."  (Pl.'s Resp. re: Kam Testimony 3.)  The probative value and fit of Kam's testimony depend somewhat on whether the Court permits Dorel to put on evidence of its product's compliance with FMVSS 213.  This motion hinges largely on the admissibility of Dorel's compliance with FMVSS.  As noted above, the Court cannot resolve this underlying evidentiary question without deciding which Restatement applies in this case.  The Court will therefore reserve judgment on this motion pending resolution of Plaintiff's motion to exclude evidence of Plaintiff's compliance with FMVSS.

### B.      Relevance and Prejudice

#### 1.      *Other accidents and statistical summaries (Document No. 129)*

Plaintiff seeks to exclude "generic statistics and data" it anticipates Dorel will introduce through its statisticians, Christine Wood and Jeya Padmanaban.  It argues that Dorel must — and cannot — demonstrate that the statistics at issue are based on accidents that are substantially similar to the crash in this case.  Dorel responds that the Third Circuit's statistical-summaries standard is dispositive of this issue, relying on *Seese v. Volkswagenwerk A.G.*, 648 F.2d 833 (3d Cir. 1981).

The "substantial similarity" test Plaintiff references applies differently to statistical evidence. *Id*. at 845-46 (upholding admission of statistical evidence involving similar vans); *see also Hernandez v. Ford Motor Co.*, Civ. A. No. 04-319, 2005 WL 6240743, at *3 (S.D. Tex. July 20, 2005) (applying *Seese* and admitting statistical evidence where statistics addressed similar products and  accident scenario compared to crash at issue).  The statistics at issue in this case satisfy this standard.  Specifically, the studies Padmanaban conducted made use of a nationwide crash database maintained by the National Highway Traffic Safety Administration ("NHTSA").  (Def.'s Opp'n re: Dissimilar Accidents Ex. B, Padmanaban report summary 1.)  She then isolated crash data involving passengers in Ethan Waltman's age range seated in child seats during crashes featuring an acceleration similar to the change in velocity at issue in the crash of the Waltmans' minivan.  (*See id*. at 2-3.)  Wood, similarly, made use of a nationwide database and focused on children aged two to four years old involved in fatal motor vehicle crashes while in child restraints between 1996 and 2000.  (Def.'s Opp'n re: Dissimilar Accidents Ex. A, Wood report 3.)  This data satisfies *Seese*'s requirements.  The Court will therefore deny Plaintiff's motion.

2.      *Foreign regulatory actions and labeling (Document No 131)*

Dorel moves to exclude evidence of foreign governments' regulatory actions, product labeling requirements and motor vehicle standards.  Plaintiff responds that it intends to introduce evidence that Dorel sold the same booster seat at issue in this case in Canada with a label warning that it was not to be used by children under forty pounds.  (Pl.'s Opp'n re: Foreign Labeling 7.)  In the United States, meanwhile, the product label stated that the seat could be used for children over thirty pounds.  (*Id.*)  Plaintiff asserts that this evidence demonstrates Dorel's knowledge that its warnings in the U.S. were inadequate and that the seat was unsafe for children under forty pounds.

Evidence of foreign labeling requirements is inherently prejudicial and presents a substantial risk of jury confusion.  *See In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1336 (S.D. Fla. 2010) (citing *In re Seroquel Prods. Liab. Litig.*, 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009)); *see also In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007) (collecting cases).  Plaintiff has also failed to show that Dorel's obligations under Canadian law are relevant here.  As Plaintiff observes, Dorel "simply placed whatever labels conformed to the location where the child seats were sold."  (Pl.'s Opp'n re: Foreign Labeling 9.)  Standing alone, this difference in American and Canadian labeling requirements does not speak to the wisdom or safety of the product's design.  The Court will therefore grant Dorel's motion.

3.      *Evidence of other defects and testing (Document No. 135)*

Dorel moves to bar Plaintiff from referencing or presenting evidence regarding other defects in its product, including defects implicated by side-impact and rollover testing conducted by Plaintiff's expert, Gary Whitman.  Plaintiff responds that, although the accident at issue in this case involved only a frontal-impact, the results of side-impact and rollover testing are relevant to

"illustrate the general principles of the defective nature of the Grand Explorer booster seat."  (Pl.'s Resp. re: Other Testing 7.)

This accident involved a frontal impact, not a rollover or side impact.  Testing that simulates other sorts of accidents is of limited probative value.  *See Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145-46 (10th Cir. 2003) (excluding evidence of rollovers as irrelevant in products liability case where tractor operator was not involved in a rollover accident).  The evidence's limited value is further compounded by the ample frontal-impact testing the parties cite elsewhere, which renders the testing Dorel describes cumulative.  The Court will therefore grant Dorel's motion.

4.     *Evidence of fines or recalls re: other Dorel products (Document No. 136)*

Dorel seeks to preclude Plaintiff from referring to "recalls or alleged fines concerning different DJG products" which would be irrelevant to this lawsuit.  (Def.'s Mot. to Exclude Evid. of Regulatory Fines, Notices and Recalls 3-4.)  Plaintiff agrees that unrelated fines or recalls are irrelevant and does not intend to introduce any such evidence.  (Pl.'s Resp. re: Fines/Recalls of Unrelated DJG Products 7.)  The Court will therefore deny this motion as moot.

5.     *Evidence of later seat design or performance (Document No. 137)*

Dorel moves to exclude evidence of shield booster criticism, changes in the state-of-the-art, claims of defect, performance evaluations, or design alternatives that occurred after the date" the company manufactured Ethan's seat, which Dorel identifies as the year 2000.  Plaintiff responds that Dorel did not change the design of the seat until it ceased production altogether in 2003.  (Pl.'s Resp. re: Design and Performance 7.)  Plaintiff also asserts that it may introduce evidence that safer seat designs existed at the time of the accident.  (*Id*. at 9.)

The parties overlook the additional problem that this state-of-the-art evidence poses.

18

Applying the Second Restatement, Pennsylvania courts have rejected evidence of industry custom or state-of-the-art as impermissible evidence of negligence irrelevant to the Pennsylvania strict liability test. *See Majdic v. Cinncinnati Mach. Co.*, 537 A.2d 334, 338-39 (Pa. Super. Ct. 1988) (quoting *Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590, 593-95 (Pa. 1987)). Under the Third Restatement, however, such evidence might be the foundation of Plaintiff's case. *See Bugosh v. I.U. N. Am., Inc.*, 971 A.2d 1228, 1233 (Pa. 2009) (Saylor, J., dissenting). In addition, as Plaintiff observes, Dorel has not specified the evidence it seeks to exclude with sufficient specificity to permit the Court to take up this question at this juncture. The Court will therefore deny Dorel's motion without prejudice to re-raise its objections at trial.

6.     *Hospital photographs of Ethan Waltman (Document No. 140)*

Dorel seeks exclusion on Rule 403 grounds of otherwise-unidentified photographs of Ethan Waltman in the hospital after the accident. While Plaintiff includes a handful of these pictures in its response, the Court cannot determine the admissibility of photographs it has not seen. *See Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 98-99 (S.D.N.Y. 2001) (deferring ruling on admissibility of hospital photographs pending pretrial hearing to review images); *cf. Heimlicher v. Steele*, 615 F. Supp. 2d 884 928 (N.D. Iowa 2009) (analyzing admissibility of photographs provided to court shortly before trial commenced). The Court will therefore deny Dorel's motion without prejudice to its rights to renew its objection with respect to specific photographs.

7.     *Evidence of medical bills (Document No. 141)*

Dorel seeks to bar Plaintiff from introducing evidence of Ethan's medical bills, and asserts that the Court must apply Medicaid billing rates in calculating future expenses. With respect to the medical bills, Dorel claims that these documents do not reflect the Waltmans' actual expenses

because they have assigned their rights to compensation for medical expenses to the state of Pennsylvania. (Def.'s Mem. re: Medical Expenses 3-4.)  This argument also serves as the basis for Dorel's contention that Ethan's future care "should . . . be evaluated at current Medicaid reimbursement rates," adjusted for inflation and present discount value. (*Id*. at 5.)

Plaintiff concedes that its recovery for past medical expenses is limited to their "reasonable value" under Pennsylvania law. (Pl.'s Resp. re: Medical Expenses 2.)  The Pennsylvania Supreme Court has ruled that the reasonable value of medical services cannot exceed the sum that a plaintiff's medical care providers accepted as payment in full.  *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786, 789-90 (Pa. 2001)*; see Perkey v. Reliable Carriers, Inc.*, Civ. A. No. 00-1639, 2003 WL 25676487, at *2 (M.D. Pa. June 20, 2003); *see also Foust v. Taylor*, Civ. A. No. 02-162, 2003 WL 25676459, at *4 (N.D. Ohio June 27, 2003) (noting that Pennsylvania law calculates reasonable value of medical expenses based on "the amount recovered rather than the amount charged.").  The Court will therefore grant Dorel's motion with respect to evidence of Ethan's medical bills.

However, the Court agrees with Plaintiff that *Moorhead* does not automatically preclude parties from offering evidence of future damages beyond Medicaid reimbursement rates.  The award in this case could extinguish Ethan's eligibility for Medicaid benefits. *See, e.g., Peterson v. Willie*, 81 F.3d 1033, 1039 n.10 (11th Cir. 1996) (noting that plaintiff's multimillion dollar pretrial settlement caused him to be ineligible for Medicaid pursuant to asset test set forth in 20 C.F.R. § 416.1205); *see also Wong v. Graham*, Civ. A. No. 03-440, 2001 WL 123932, at *11 n.6 (Tex. Ct. App. Feb. 15, 2001) (not designated for publication) (describing "the absence of certainty that Medicare or Medicaid will cover future expenses" in considering application of collateral source rule).  Because it is not clear that Ethan Waltman will be entitled to Medicaid benefits in perpetuity,

the Court will deny Dorel's motion with respect to the calculation of future medical expenses.

### C.   Miscellaneous Motions

#### 1.   The Waltmans' criminal histories (Document No. 128)

Ethan Waltman's parents both have criminal histories.  His father is incarcerated, having pled guilty to charges of receiving stolen property and burglary.  (Pl.'s Mem. in Supp. of Mot. re: Criminal Histories 3; Def.'s Criminal Histories Opp'n Ex. 1, sentencing record for Benjamin Waltman.)  Kimberly Waltman has been charged with theft by deception and receiving stolen property, although Plaintiff represents that these charges have been dismissed.  (Pl.'s Criminal Histories Mem. 3.)  Plaintiff seeks to bar Dorel from introducing evidence of the Waltmans' criminal histories, arguing that this information is both irrelevant and unfairly prejudicial.  (*Id*. at 3-4.) Plaintiff also argues that the Waltmans' criminal histories constitute inadmissible character evidence within the meaning of Rule 404.  (*Id*. at 4-5.)

Federal Rule of Evidence 609 allows impeachment of a witness by evidence of his conviction for a crime if "it can readily be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness."  Fed. R. Evid. 609(a)(2). Benjamin Waltman's convictions for receiving stolen property and burglary both involve *crimen falsi* that are admissible to impeach his character for truthfulness under this rule.  *See Del Grosso v. City of Phila.*, Civ. A. No. 09-1000, 2010 WL 3384822, at *1 (E.D. Pa. Aug. 20, 2010); *cf. Giles v. Rhodes*, Civ. A. No. 94-6385, 2000 WL 1425046, at *12 (S.D.N.Y. Sept. 27 2000) (describing Rule 609(a)(2) evidence as "automatically admissible").  Assuming Dorel remains within the bounds of Rule 609 and uses this evidence solely to attack Benjamin Waltman's credibility, the Court need not address Plaintiff's Rule 404(b) arguments on this point.  *See GEM Realty Trust v. First Nat'l*

*Bank of Boston*, Civ. A. No. 93-606, 1995 WL 127825, at *6 (D.N.H. Mar. 20, 1995) (citing *United States v. Tracy*, 36 F.3d 187, 192 (1st Cir. 1994)).   Dorel may thus introduce evidence of these convictions at trial to attack Benjamin Waltman's credibility.

Kimberly Waltman's criminal record implicates Rule 608.   She was charged, but never convicted, of crimes including theft by deception and theft by unlawful taking or disposition.   (Def.'s Criminal Histories Ex. 2, criminal complaint against Kimberly Waltman.)   These charges stem from Kimberly Waltman's alleged eBay business and accusations that she took items from customers to place them for sale, but failed to return unsold items or sale proceeds.   (*Id*.)   Dorel argues that it may inquire into this purported eBay scam on cross-examination and introduce "opinion evidence regarding the Waltmans' reputation for truthfulness in the community, as reflected by the Waltmans' involvement" in the fraudulent business pursuant to Rule 608.

Rule 608(b) permits cross-examination of a witness concerning specific instances of conduct probative of her character for untruthfulness.   The first step in a Rule 608(b) analysis is to determine whether the specific conduct at issue is probative of the witness's character for truthfulness.   *See, e.g., United States v. Hill*, 550 F. Supp. 983, 990 (E.D. Pa. 1982).   Next, the court must decide whether unfair prejudice substantially outweighs the evidence's probative value.   *Id*. (citing Fed. R. Evid. 403).   At this juncture, it appears that cross-examination regarding the Waltmans' eBay store would be permissible under this standard.

Plaintiff's Rule 404(b) argument does not alter this analysis.   The Third Circuit approaches cross-examination "about other bad acts . . . to challenge credibility" through the lens of Rule 608 rather than Rule 404(b).   *United States v. Davis*, 183 F.3d 231, 257 n.11 (3d Cir. 1999).   While Rule 404(b) might come into play if Dorel attempted to introduce extrinsic evidence on this point, it does

22

not bar cross-examination that is otherwise permissible under Rule 608.  *See, e.g., United States v. Irizarry*, 341 F.3d 273, 311-12 (3d Cir. 2003).

Dorel's desire to introduce opinion testimony tied directly to the Waltmans' eBay activities presents another set of concerns.  Rule 608(a) permits credibility attacks based on "evidence in the form of opinion or reputation," but only if the evidence refers solely to the witness's character for truthfulness or untruthfulness.  Rule 608(b) prohibits extrinsic evidence of specific instances of conduct other than convictions admissible under Rule 609.  The testimony Dorel describes in its opposition on this point could be interpreted as an attempt to establish specific instances of conduct — the Waltmans' allegedly fraudulent business transactions — as "reputation" evidence.  These witnesses "must testify to reputation rather than to the specific acts that established the reputation." *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985).  While the Court denies Plaintiff's motion at this stage, it will not permit Dorel to circumvent Rule 608(b) at trial by couching extrinsic evidence of the Waltmans' purported eBay scam as opinion or reputation evidence.

### 2.     *Consumer advocacy groups (Document No. 132)*

Dorel has moved to exclude evidence or testimony regarding recommendations of child safety advocacy organizations relating to child restraint use, including commentary by the American Academy of Pediatrics and Safe Ride News.  Plaintiff responds that such evidence is admissible through its experts under Rule 703.

Rule 703 provides that expert opinions based on otherwise inadmissible hearsay may be admitted if the facts or data relied upon are reasonably relied upon by experts in the particular field in forming opinions.  *See In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999).  It is not clear at this juncture whether the statements the parties reference satisfy this standard.  Nor is it clear that any

such otherwise inadmissible statements could be disclosed to the jury, as this analysis requires the Court to weigh the probative value and prejudicial effect of statements it has not seen incorporated into expert testimony it has not heard. *Cf. Viking Yacht Co. v. Composites One LLC*, 613 F. Supp. 2d 637, 645 n.11 (D.N.J. 2009) (reserving judgment on admissibility of alleged hearsay underlying expert report until party sought admission at trial). The Court will therefore deny Dorel's motion without prejudice.

### 3. Scientific publications by non-testifying experts (Document No. 133)

Dorel seeks an order barring evidence or testimony regarding a number of studies and publications. The basis for this motion is nearly identical to the argument presented in Dorel's motion regarding commentary by consumer advocacy groups. (*See* Def.'s Mem. re: Publications 5.) As Dorel observes, this evidence may be admissible subject to the Court's determination that these publications are reasonably relied upon my Plaintiff's experts and that their admission would not be unfairly prejudicial. (*Id.*) Dorel's motion is premature. The Court will therefore deny Dorel's motion without prejudice.

### 4. Evidence of or references to media coverage (Document No. 134)

Dorel asks that the Court "exclude from evidence and prohibit all mention of or reference to newspapers, magazines, and news media reporting or commenting" on "shield boosters," including coverage of lawsuits, accidents, and simulation testing. (Br. in Supp. of Def.'s Mot. re: Media Commentary 1.) While Dorel names no specific article or source, it asserts that any such publication would be inadmissible hearsay, irrelevant, and unfairly prejudicial. Plaintiff responds that it may offer media reports for a non-hearsay purpose, to show that Dorel had notice of its product's dangerous design. (Pl.'s Resp. re: Media Commentary 7.)

24

It is impossible to determine whether these articles, if any, will run afoul of the hearsay, relevance and prejudice standards Dorel references.  The Court will therefore deny Dorel's motion without prejudice to renewed objections "in the context of the testimony elicited at trial."  *Shumek v. McDowell*, Civ. A. No. 09-216, 2011 WL 183985, at *6 (M.D. Pa. Jan. 19, 2011); *cf. Miller ex rel. Miller v. For Motor Co.*, Civ. A. No. 01-545, 2004 WL 4054843, at *16 (M.D. Fla. July 22, 2004) (granting motion to bar admission of media reports, but permitting plaintiff to seek admission of "specific items for specific reasons" at trial).

5.      *Other accidents, lawsuits and verdicts (Document Nos. 138, 139)*

Dorel has moved to preclude evidence "concerning other automobile accidents, claims or lawsuits without a prior showing of substantial similarity by Plaintiff."  (Def.'s Br. in Supp. of Mot. Re: Other Accidents, Claims and Lawsuits 1.)  Dorel also seeks to exclude all evidence of other lawsuits or verdicts "involving different products and different fact scenarios" as irrelevant, inadmissibly prejudicial, and likely to be hearsay.  Plaintiff responds that it may introduce evidence of other lawsuits or verdicts to establish that  the car seat was unreasonably dangerous and that Dorel had notice of the dangers its defective design posed.  (Pl.'s Resp. re: Other Accidents, Claims and Lawsuits 7-8.)  It states that it will lay the proper foundation for these other incidents at trial.  In response to Dorel's preemptive hearsay objection, Plaintiff asserts that it will only seek to introduce evidence if it falls within the business records exception of Federal Rule of Evidence 803(6).

Evidence of prior accidents involving the same product under similar circumstances is admissible to show that the defendant had notice of the danger, the existence of the danger, and the cause of the accident.  *Smith v. Crown Equip. Corp.*, Civ. A. No. 97-541, 1998 WL 63392, at *4 (E.D. Pa. Aug. 21, 1998) (quoting *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 97 (3d Cir. 1983)).

As Plaintiff seeks to introduce direct evidence of a design defect, it bears the burden of demonstrating that the accidents occurred under circumstances substantially similar to those at issue in this case. *Barker v. Deere & Co.*, 60 F.3d 158, 163 (3d Cir. 1995). The Court will grant Dorel's motions to the extent that they seek exclusion of evidence of jury verdicts in other cases. *See Smith*, 1998 WL 633982, at *5 ("The details of a substantially similar accident, itself, are sufficient to establish evidence of notice and design defect without admitting the potentially prejudicial details of specific injuries or jury verdicts."). With respect to the remainder of these motions, the Court will rule on the relevance and hearsay issues the parties identify if these questions arise at trial. The Court therefore will otherwise deny Dorel's motions without prejudice at this stage.

6.      *Dorel's assets, discovery and defense costs (Document No. 142)*

Dorel seeks to exclude evidence of the company's assets and litigation expenses. Plaintiff does not oppose Dorel's motion to the extent it touches upon "critical or demeaning references to Defense Counsel," which Plaintiff describes as any reference to the fact that "counsel is based in Chicago and is the exclusive law firm for defending the vast majority of lawsuits brought against Defendant, or that [Defendant] has chosen to pay the firm's attorneys massive sums of money rather than settle the suits, unless for some reason, Defendant opens the door to this information and it becomes necessary for impeachment." (Pl.'s Opp'n re: Dorel's Assets 6-7.) The Court will therefore grant Dorel's motion as unopposed with respect to Plaintiff's references to Dorel's litigation costs or defense counsel.

However, Plaintiff argues that evidence of Dorel's wealth and assets should be admitted as relevant to punitive damages. A company's wealth may be considered in determining punitive damages. *See, e.g., Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 95 n.14 (Pa. Super. Ct. 2007); *see also*

*Carson v. ITT Hartford Ins. Grp.*, Civ. A. No. 91-3113, 1991 WL 147469, at *3 (E.D. Pa. July 24, 1991). The Court will therefore deny Dorel's motion with respect to evidence of Dorel's assets. However, if appropriate at trial, the Court may exercise its discretion to bifurcate the trial to allow for a separate punitive damages phase. *Cf. Witherbee v. Honeywell, Inc.*, 151 F.R.D. 27, 29 (N.D.N.Y. 1993) (citing *Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d 19, 22 (3d Cir. 1984)).

7.      *Dorel's decision to end production of the car seat (Document No. 143)*

Dorel argues any evidence of its decision to cease production of the Grand Explorer booster seat is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure. Plaintiff responds that it will introduce Dorel's decision to stop manufacturing the seat to impeach the testimony of Richard Glover, a Dorel employee who stated at his deposition that the company ended production because sales were down. Plaintiff is generally correct that subsequent remedial measures may be admissible for impeachment purposes. *See Compl. of Consolidation Coal Co.*, 123 F.3d 126, 136 (3d Cir. 1997). However, the Third Circuit has cautioned trial courts that this exception must be treated "circumspectly, because any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach a party's testimony." *Id.* (internal quotation marks omitted).

Plaintiff states that it will impeach Glover's testimony by introducing evidence that the seat was in fact "unreasonably dangerous and unsafe for its intended use," but that it "does not intend to use this evidence to establish that the seat was defective." (Pl.'s Opp'n re: Ceasing Production 7.) Plaintiff thus couches evidence intended to prove the existence of a design defect as "impeachment." This evidence is barred by Rule 407. *See Hagaman v. Merrell Dow Pharms., Inc.*, Civ. A. No. 84-2202, 1987 WL 342949, at *10 (D. Kan. June 26, 1987) ("Defendant could have stopped production

for any number of reasons, and introduction of its decision would violate the spirit if not the letter"
of Rule 407).  The Court will therefore grant Dorel's motion with respect to its decision to cease
production of the Grand Explorer.


**IV.     CONCLUSION**

The Court will dispose of the parties' motions as detailed above.  An Order consistent with
this Memorandum will be docketed separately.